Patricia S. (Pat) LANG, et al., Plaintiffs,

v.

**KANSAS CITY POWER & LIGHT CO., Defendant.**

No. 99–0463–CV–W–3.

United States District Court, W.D. Missouri, Western Division.

March 1, 2001.

---

Dennis E. Egan, Bert S. Braud, The Popham Law Firm, Kansas City, MO, Dirk Hubbard, John Klamann, Klamann & Hubbard, P.A., Overland Park, KS, Michael R. Fletcher, Sanders, Simpson, Fletcher & Smith, P.C., Kansas City, MO, for Plaintiff.

James Randall Coffey, Leonard Singer, Bioff, Finucane, Coffey & Holland, LLP, Jennifer Gille Bacon, R. Lawrence Ward, Shughart, Thomson & Kilroy, Robert P. Gingrich, Kansas City, MO, for Defendant.

*ORDER (1) DENYING PLAINTIFFS' MOTION FOR ORAL ARGUMENT, (2) DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, (3) GRANTING DEFENDANT'S MOTION TO STRIKE EXPERT REPORT, (4) DENYING DEFENDANT'S MOTION TO STAY DISCOVERY AS MOOT, AND (5) CERTIFYING ORDER FOR INTERLOCUTORY APPEAL*

SMITH, District Judge.

Pending is Plaintiffs' Motion for Class Certification, as well as several related motions. As set forth more fully below, the Court grants Defendant's Motion to Strike the expert report submitted with Plaintiffs' Reply Brief. The Court denies both Plaintiffs' Motion for Oral Argument and Plaintiffs' Motion for Class Certification. Defendant's Motion to Stay Discovery is denied as moot, given that Defendant asked that the stay expire when the class certification issue was re-

solved. Finally, the Court *sua sponte* certifies this Order for an interlocutory appeal.

## I. INTRODUCTION

Plaintiff Patricia Lang filed this suit on May 11, 1999, asserting various claims arising under 42 U.S.C. § 1981. On October 8, 1999, she filed a First Amended Complaint that advanced claims on behalf of a class of individuals. A Second Amended Class Action Complaint was filed on July 13, 2000; Plaintiffs' request to file a Third Amended Class Action Complaint is pending.

On December 2, 1999, an Order was issued permitting the parties to engage in discovery related to class certification issues. Pursuant to a series of extensions, the deadline for the filing of the motion to certify the class was extended to November 1, 2000.

The Second Amended Class Action Complaint names ten representatives for the class; an eleventh Plaintiff (Olen Gibson) is named in his separate Intervenor's Complaint (Doc. # 40). The clearest statement of Plaintiffs' proposed class definition appears in paragraph 35 of the Second Amended Class Action Complaint, wherein they declare that the action is brought "on behalf of all African–American persons employed by KCPL at any time from May 11, 1994 to the present (the 'Class Period') who have been and/or continue to be, or may in the future be, adversely affected by KCPL's racially discriminatory policies and practices complained of herein, excluding those persons who have previously filed cases or previously settled cases involving all of their claims against Defendant for racial discrimination (the 'Class')." The racially discriminatory policies and practices referred to in the Second Amended Class Action Complaint appear in paragraph 2, and consist of the following: (a) racially hostile working environment, (b) differing job requirements, (c) denial of promotions, (d) compensation, and (e) discipline, termination, and/or retaliation.

■ The class definition is overbroad. Review of the Second Amended Complaint demonstrates that not all class members are asserting each of the five claims described in paragraph 2 of the Second Amended Com-

plaint. The Supreme Court has "repeatedly held that a class representative must be part of the class and posses the same interest and suffer the same injury as the class members." *General Tele. Co. of the Southwest v. Falcon,* 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (quotations omitted); *see also Roby v. Southwestern R. Co.,* 775 F.2d 959, 961 (8th Cir.1985). Thus, for instance, Lawrence Davis cannot be a representative for a class of individuals raising claims about discriminatory pay because he does not assert such a claim. Second Amended Complaint, ¶ 10. This is just one example; many others can be presented, but space does not permit. It is sufficient to note that most Plaintiffs do not present all of the claims that the class intends to pursue. In addition, the class as defined lacks commonality; a person claiming that s/he was terminated based on race does not have common factual or legal arguments when compared to a person claiming that s/he was denied a promotion based on race, and neither of them has a common legal or factual claim when compared to a person complaining of a racially hostile work environment.

■ However, "[a] court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly." *Robidoux v. Celani,* 987 F.2d 931, 937 (2d Cir.1993); *see also* 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Civil Procedure, § 1790 ("A formal motion under subdivision (c)(4) is unnecessary; the court may act on its own initiative."). The problems with Plaintiffs' proposed definition could be remedied by dividing the class into subclasses, one for each of the five legal claims the putative class wishes to assert. Accordingly, this will form the framework for the Court's discussion.

The request for oral argument is denied. The parties' briefs are voluminous, and should be sufficient to apprise the Court of their respective positions. To the extent that Plaintiffs seek the opportunity to augment their filings, the Court holds that (1) oral argument is not required and (2) given the time that has been afforded, everything Plaintiffs' believe needed to be said should be included in their submissions.

## II. DISCUSSION

In order to be certified, each subclass must satisfy the four prerequisites set forth in Rule 23(a). *E.g., Roby,* 775 F.2d at 961; *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 559 (8th Cir.1982), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983). Those requirements are:

(1) the class is so numerous that joinder of all members is impracticable,

(2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representative parties will fairly and adequately protect the interests of the class.

Upon satisfying these four prerequisites, each subclass must qualify under one of the three subparts of Rule 23(b). Plaintiffs contend their claims for injunctive and declaratory relief can satisfy Rule 23(b)(2) and that their claim for punitive damages satisfies Rule 23(b)(3). Rule 23(b)(2) applies if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Rule 23(b)(3) permits creation of an "opt-out" class seeking monetary damages if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

With this general discussion of Rule 23's requirements in place, the viability of each subclass can be addressed.

### A. Subclass I—Hostile Work Environment

#### 1. Numerosity

■ As stated in Rule 23(a)(1), the initial test of numerosity is whether the potential

plaintiffs are so numerous that joinder is not practical. "In addition to the size of the class, the court may consider the nature of the action, the size of the individual claims, the inconvenience of trying individual suits, and any other factor relevant to the practicability of joining all the putative class members." *Paxton*, 688 F.2d at 559–60.

Plaintiffs seem to suggest that the class is numerous because the total number of African–American employees is too large to effectively join in one action. In 1999, Defendant had 2,198 employees, 207 of which were African–Americans. The Court does not agree that this is the proper number to consider with respect to the hostile work environment subclass. A class may be certified to challenge an employer's practice or policy, which would permit a presumption that all employees are affected because all employees are affected by an employer's policies and practices. However, Plaintiffs have not identified the policy or practice in question. Numerosity could also be demonstrated if the number of individuals asserting claims is high, thereby suggesting the existence of a de facto policy—but close scrutiny of the materials Plaintiffs have offered demonstrates that the number of members of this subclass is too small to justify certification.

 The statute of limitations on Plaintiffs' claims is five years. *See Goodman v. Lukens Steel Co.*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987) (holding that state statute of limitations for personal injury should be borrowed to establish limitation period under section 1981); *Cross v. General Motors Corp.*, 778 F.2d 468, 469–70 (8th Cir. 1985), *cert. denied*, 476 U.S. 1170, 106 S.Ct. 2893, 90 L.Ed.2d 980 (1986) (acknowledging prior approval of five year period based on Mo.Rev.Stat. § 516.120). Accordingly, the Court has reviewed Plaintiffs' submissions to determine how many of them raise claims of racial harassment based on events occurring in the five years preceding this lawsuit. The Court's findings are as follows:

- Dan Davidson made racial comments to Bailus Tate, but by Plaintiffs' admission Tate—an African–American—was not offended by the comments. Tate cannot be a member of the class because he

denies being offended. *Cf. Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) ("if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.").

- Davidson also made racially disparaging comments while supervising the Call Center, which has caused several employees in that department to allege they worked in a racially hostile working environment. Davidson left Defendant's employ in July 1998. Davidson Depo. at 7.

- Defendant's policies do not require termination of employees who use racial slurs. Of course, the importance of this fact is minimal because the law does not require that employees who use racial slurs be terminated.

- In 1988—well before the limitation period in this suit started—somebody posted a despicably racist notice at an unspecified place on Defendant's property.

- At an unspecified time, the supervisor in the meter reading department (Jim Murray) observed a black doll hung by a noose in an African–American employee's mailbox. He removed the doll, attempted to identify the perpetrator, and "made it very clear to the entire group that was not appropriate and it better never happen again." Murray Depo. at 32–33. There is no evidence that any African–American employees (or, for that matter, that any employees other than those involved in the incident) observed the doll in the noose.

- In 1993—before the limitation period commenced—Katie Miller (a Material Dispatcher) complained about racist comments being made by a supervisor.

- A June 21, 1994 memo prepared by a Human Resources employee reports anecdotal complaints about racist comments at the La Cygne power station. The report does not indicate when these events occurred, nor does it identify the complainant(s).

- Maggie Mitchell performed a survey by interviewing sixty-six employees at the La Cygne power station on or around August 2, 1994. Fifty-eight of the employees were bargaining unit employees, and forty-eight of those "made very few comments." Based on the statements of the employees who responded, Mitchell reported that

 [i]ndivduals use slurs regarding minorities and women when talking with each other. Generally name calling [and] using slurs is not made in the presence of people of color or females. The general feeling was they would not maliciously hurt someone with name calling or language. Individuals felt there is name calling of each other, however, it is done in a joking manner. Jokes and pranks are often played on each other. Language may be offensive to some individuals. If anyone said it was offensive to them, it would stop according to the interviewees.

- In February 1996, an investigation revealed that the use of racially offensive language at the Hawthorne Plant by one of the employees "continues to be a problem."

- Shena Young declares that, during an unspecified period "[d]ay in and day out, the meter reading department was a racially hostile environment for African-Americans." However, Young is a former employee. Plaintiffs' primary justification for a class action is to obtain injunctive relief, but as a former employee Young lacks standing to seek injunctive relief.

- Excluding Tate, Miller and Young for the reasons stated above, Plaintiffs have identified sixteen current employees who allege they were exposed to a hostile working environment.

- Two of the sixteen employees (Herb Bankston and Sylvester Webb) work in the meter reading department.[1]

- Six of the sixteen employees (Walt Peircey, Mary Anderson, Joe Greene, Norman Walker, Grover Harris, and John Smith) worked at the Hawthorne Plant.

- Seven of the sixteen employees (Deidre Hamilton, Judy Steward, Angela Baker, Danita Fagins, Regina Curry, Rachelle Price and Mary McDaniel) worked in the Call Center. At least one of these women (Regina Curry) is also a former employee and therefore cannot benefit from injunctive relief.[2]

- One of the employees (Patricia Lang) worked in an unspecified department (although her affidavit indicates that she is an architect).

- None of the Plaintiffs worked at the La Cygne plant.

- The four locations discussed above—the Meter Reading Department, the Call Center, the Hawthorne Plant and the La Cygne station—are separated geographically. Thus, for instance, a meter reader has no occasion to enter the Call Center, and people working in the Call Center have no contact with the Hawthorne Plant.

The Court concludes that sixteen claimants is not a sufficiently large number to demonstrate numerosity. Sixteen plaintiffs can effectively be joined in a single lawsuit—assuming, of course, that their claims are sufficiently similar—but in this case, it is doubtful that all of their claims are sufficiently similar. It might be more appropriate to file separate lawsuits based on the geographic location of the working environment, joining each plaintiff in the suit corresponding to their workplace—in which case only four or five lawsuits will be required. At worst, if joinder is inappropriate only sixteen individual suits will be created, and dealing with this number of individual suits is not such an onerous task that a class action is justified.

---

1. The Court will include Webb for purposes of this discussion even though his affidavit has not been supplied.

2. The Court will include Baker for purposes of this discussion, even though her affidavit has not been supplied.

### 2. Commonality

■ Commonality "does not require that every question of law or fact be common to every member of the class, and may be satisfied, for example, 'where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated.'" *Paxton,* 688 F.2d at 561 (quoting *American Finance Sys., Inc. v. Harlow,* 65 F.R.D. 94, 107 (D.Md.1974) (other internal citations omitted)). A hostile working environment claim requires proof that "(1) the employee is a member of a protected group; (2) the employee is subjected to unwelcome harassment; (3) a causal nexus exists between the employee's membership in the protected group and the harassment; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt and effective remedial action." *Mems v. City of St. Paul,* 224 F.3d 735, 738 (8th Cir.2000). This legal standard will apply to all members of the class, and for that reason there is a common question of law guiding all the claims of this subclass. Nonetheless, the Court does not believe this is sufficient to satisfy the commonality requirement. However, the Court's views on the matter are similar to those set forth in the next subsection related to typicality, and will not be repeated here.

### 3. Typicality

■ Typicality requires a demonstration that the members of the class have the same or similar grievances. *Paxton,* 688 F.2d at 562 (citing *Donaldson v. Pillsbury Co.,* 554 F.2d 825, 830 (8th Cir.), *cert. denied,* 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977)). "The burden of showing typicality is not an onerous one. It does, however, require something more than general conclusory allegations that unnamed blacks have been discriminated against." *Id.* "Factual variations in the individual claims will not normally preclude class certification *if the claim arises from the same event or course of conduct as the class claims, and* gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp. United, Inc.,* 84 F.3d 1525, 1540 (8th Cir.1996) (emphasis added). Here, the claims lack typicality because they do not arise from the same event or course of conduct. For instance, the working environment faced by the employees at the Call Center involves different events and conduct than the environment at the Hawthorne Plant.

Relying on *Paxton,* Plaintiffs argue that the evidence they will present is the same for each of them. In *Paxton,* the Eighth Circuit observed that "[m]uch of the evidence relevant to the individual claims, such as that relating to the subjective nature of the promotion decisions and the bank's failure to post vacancies, will be proffered to prove the class claims as well." 688 F.2d at 562. There is no such common evidence in this case. Whether a working environment is hostile depends upon the facts relative to that environment. *Kimzey v. Wal–Mart Stores,* 107 F.3d 568, 573 (8th Cir.1997) ("In a hostile work environment claim, evidence concerning all circumstances of *the complainant's* employment must be considered . . . ." (emphasis supplied). Thus, employees at the Call Center cannot rely upon incidents at the La Cygne station to prove that their working environment was racially hostile.) *Cf. Kline v. City of Kansas City,* 175 F.3d 660, 668 (8th Cir.1999), *cert. denied,* 528 U.S. 1155, 120 S.Ct. 1160, 145 L.Ed.2d 1072 (2000).

The Supreme Court has cautioned that

> Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims.

*Falcon,* 457 U.S. at 157, 102 S.Ct. 2364. Other than the fact that there is more than one claimant category (a) applies to this case. The members of the subclass do not share any other common questions of law or fact, nor are their claims typical of each other—or

if they are, they are typical of so few other claimants that numerosity is lacking. Thus, this subclass is essentially a group of differently-situated individuals, each claiming to have been wronged, and each asserting— without support or explanation—that some policy has caused that wrong. The fact that there is more than one person willing to make this conclusory allegation does not transform their assorted individual situations into a valid class.

Moreover, liability will not arise simply because the events occurred; as noted earlier, liability exists only if it is proved that "the employer knew or should have known of the harassment and failed to take prompt and effective remedial action." *Mems,* 224 F.3d at 738. Plaintiffs' own submissions demonstrate that, in some instances, Defendant took steps to address the problems recited; on those cases, the examination into the adequacy of Defendant's varying responses adds another layer of differentiation, further destroying typicality.[3]

Further subdividing this subclass based on the location of their work areas will not salvage matters. First, the largest such "sub-subclass" supported by the record would be the seven employees at the Call Center—and a class of seven would not be sufficiently numerous to justify certification. Second, even among employees at a given location, there are differences in what they saw, heard, and otherwise experienced. For instance, not all meter readers were treated the same way.

### 4. Adequacy of the Class Representative

"The Rule 23(a)(3) requirement of typicality and the Rule 23(a)(4) requirement that the named representative adequately represent the entire class overlap. If the class representative's claims are not typical of the class, the representative cannot adequately protect the interests of the absent class members." *Harding v. Tambrands, Inc.,* 165 F.R.D. 623,

628 (D.Kan.1996). The Court's observations regarding the lack of typicality apply in this context as well. Beyond this observation, the Court makes no determination regarding the ability of class counsel to perform their obligations.

### 5. Injunctive Relief

Assuming this subclass could satisfy each of the four prerequisites set forth in Rule 23(a), the subclass must still satisfy one of the categories described in Rule 23(b). Plaintiffs first invoke Rule 23(b)(2), arguing that they qualify under this provision simply because they have indicated their desire to seek injunctive relief. The mere fact that Plaintiffs ask for injunctive relief does not automatically satisfy Rule 23(b)(2).

Rule 23(b)(2) is appropriate if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." In the employment context, 23(b)(2) is properly invoked when a policy or practice is challenged, and injunctive or declaratory relief is necessary to prohibit or change that policy or practice. With respect to the hostile environment claim, there is no policy or practice at issue. Plaintiffs' complaints do not arise from official company action directed uniformly toward them, but rather from separate, discrete events in their individual workplaces. Given the small number of employees in the class and the factually varied bases for their claims, there is no policy or practice for the Court to address. Finally, it is worth noting that a single victorious plaintiff is entitled to appropriate injunctive relief. Thus, injunctive relief sought by the class (e.g., training) can be obtained by a single plaintiff, removing the need for a class action.

### 6. Punitive Damages

Plaintiffs also argue that the claim for punitive damages can be certified under

---

**3.** "Factors the Court may consider when assessing the reasonableness of [the employer's] remedial measures include the amount of time elapsed between the notice of harassment, which includes but is not limited to a complaint of .... harassment, and the remedial action, and the options available to the employer such as employee training sessions, disciplinary action taken against the harasser(s), reprimands in personnel files, and terminations, and whether or not the measures ended the harassment." *Stuart v. Gen. Motors Corp.,* 217 F.3d 621, 633 (8th Cir. 2000).

Rule 23(b)(3). Rule 23(b)(3) permits certification "if the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and ... a class action is superior to other available methods for the fair and efficient adjudication of the controversy." A "punitive damages" class is inappropriate.

In the context of this legal claim, common questions do not predominate over individual issues. For any class member to obtain punitive damages, they must first demonstrate they have been subjected to a hostile work environment. This requires proof for each of them, as established in *Mems*, regarding their individual experiences. This will require each class member to separately prove the nature of the harassment they experienced, that Defendant knew or should have known of the harassment, and that Defendant's response (if any) was not prompt or effective. Moreover, a class action is not superior to individual suits. Assessment of punitive damages is not automatic; it depends upon the facts of each particular plaintiff. Thus, the facts surrounding each Plaintiff's circumstances must be separately considered by the jury, so the class will ultimately be tried in the same manner as would separate trials.

### B. Subclass II—Differing Job Requirements

Plaintiffs provide scant detail about this claim, making it impossible for the Court to meaningfully evaluate it. Plaintiffs present issues regarding pay inequities, but they assert this as a separate claim; therefore, the claim based on differing job requirements must refer to something other than pay inequities. Similarly, Plaintiffs have presented the hostile work environment claim separately and distinctly from this claim. The Plaintiffs' failure to explain the claim of differing job requirements serves as sufficient reason to reject this subclass. Nonetheless, the Court has reviewed Plaintiffs' submissions in an attempt to divine Plaintiffs' purpose.

4. The Court will consider these affidavits even though the copies supplied to the Court are not signed.

### 1. Numerosity

A review of the Second Amended Complaint and other materials submitted reveals the following:

- Patricia Lang alleges that she was "required to report to a subordinate employee with less education and less seniority." Second Amended Complaint, ¶ 7. She also alleges that the person she was reporting to "started downgrading her performance and harassing her with undue oversight," Second Amended Complaint, ¶ 85, and that she was "given a poor performance appraisal under circumstances which were manufactured" by the evaluator. Second Amended Complaint, ¶ 90.

- The Second Amended Complaint provides scant details about any other individual's claim. The rest of the Plaintiffs allege, in identical language, that Defendant has subjected them to "unlawful terms and conditions of employment that are different from similarly situated or less qualified Caucasian employees, including but not limited to, practices related to promotional opportunities, standards for evaluation, company goals for employees, working environment, discipline, and termination ...." Claims relating to promotion, discipline and termination have been raised separately, so claims based on "terms and conditions" must raise distinct issues. It may be that Plaintiffs intend their challenge to "terms and conditions" encompass "standards for evaluation" and "company goals for employees." However, none of the material supplied by Plaintiffs—including particularly the Plaintiffs' affidavits—suggests they are presenting this claim.

- Mary Anderson's affidavit declares that she has been denied restricted duty work and has a heavier workload than Caucasian employees. Walt Piercey's affidavit also discusses his failure to be assigned restricted duty.[4]

- Shena Young—a former employee—alleges that she "was subjected to racial discrimination . . . in the terms and conditions of her employment at KCPL." Second Amended Complaint, ¶ 16. Her affidavit does not shed any light on this matter. Ultimately, it does not matter; as noted earlier, Plaintiffs' primary justification for class certification rests on their request for injunctive relief, and none of the relief would benefit Young.
- Danita Fagins' affidavit declares that she is not invited to some supervisor meetings.
- The affidavits of Regina Curry, Deirdre Hamilton, Rachelle Price, Mary McDaniel, say (in astonishingly identical language) that they "received much tougher scrutiny tha[n] did Caucasians."
- Whitney Johnson declares that she "suffered . . . racially-motivated decisions regarding my daily work and assignments."
- Mary Rabon complains of receiving "unfair evaluations."

Despite the repetitive and broadly-worded allegations in the Second Amended Complaint (which are not subject to further clarification in the proposed Third Amended Complaint), Plaintiffs have identified a total of ten people who will be in this subclass. This number is sufficiently small that joinder (if justified) is possible, and individual trials (if needed) will not be so onerous that the parties or the Court will be benefitted by certification.

### 2. Commonality

■ Plaintiffs seem to suggest that there is a common question binding these individuals because they all claim to be subject to "discriminatory terms and conditions." However, discrimination in the abstract does not satisfy commonality; what is required is a policy or practice that is targeted as discriminatory—after all, this is the basis upon which Plaintiffs contend they are entitled to relief. A simple assertion that a policy exists is insufficient, see Falcon, 457 U.S. at 157–58, 102 S.Ct. 2364, but this is all Plaintiffs really advance to support their position. Absent a discriminatory practice or policy, there is

nothing to enjoin. Plaintiffs' burden requires them to identify the specific practice or policy they are attacking. Cf. Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988) (citing Connecticut v. Teal, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982)); Emanuel v. Marsh, 897 F.2d 1435, 1439 (8th Cir.1990).

■ Plaintiffs are not attacking a single practice or policy; several policies are in play. Two employees complain about the restricted duty policy, one complains about her daily assignments, one complains about not being invited to meetings, one complains about the chain of command, and six complain about undue scrutiny and/or unfair evaluations. The members of this subclass lack commonality.

### 3. Typicality & Adequacy of Representation

The lack of commonality destroys any possibility that the claims in this subclass can be typical. Moreover, as observed in Part III(A)(4), the lack of typicality means the representatives cannot adequately represent the class.

### 4. Injunctive Relief

Plaintiffs' failure to identify or otherwise target a policy or practice makes classwide injunctive relief inappropriate. Thus, certification under Rule 23(b)(2) is not proper.

### 5. Punitive Damages

The prior discussion amply demonstrates that the common issues do not predominate over the individual issues. This conclusion is augmented by the fact that even those with seemingly similar claims do not have much in common. For instance, those alleging they received unfair evaluations have nothing in common beyond that allegation: for each such Plaintiff, separate proof will be required regarding (1) the evaluation's contents and (2) the truth or falsity of those contents. Finally, the Court concludes that a class action is not a superior method for adjudicating these class members' claims for punitive damages because separate trials will first be required to determine which ones are enti-

tled to share in any such award. Separate trials is the best method of adjudicating these claims.

### C. Subclass III—Pay

#### 1. The Expert's Report

This claim, along with Plaintiffs' other two remaining claims, stands in a slightly different situation than the first two claims because Plaintiffs have provided expert statistical testimony to support the claim. Defendant argues that the report should not be considered. The Court agrees that Plaintiffs have not acted properly, and the expert's report will not be considered. Additionally, the Court holds that Dr. Chen's report would not aid Plaintiffs' cause.

### (a) The Motion to Strike

■■ The report was not provided as an exhibit to Plaintiffs' Suggestions in Support of Motion for Class Certification, which was filed on November 1, 2000. A passing reference to expert testimony appears in footnote seven on page twelve, where Plaintiffs declare that they "will present evidence through the Report of Dr. Jie Chen which shows that there is a common issue involving 'disparity' for the Class." Of course, for Plaintiffs to have made this declaration, they had to know both that they had retained Dr. Chen and that he had reached conclusions regarding the statistical evidence. However, prior to this time, Plaintiffs had not disclosed the existence of Dr. Chen as an expert. During a telephone conference held on November 3, 2000, Plaintiffs' footnoted reference to Dr. Chen was briefly discussed; at that time, Plaintiffs' counsel advised the Court and Defendant's counsel that only a Reply Brief would be filed and that there would be no supplement to the previously filed materials; counsel did not indicate that Dr. Chen's report would be forthcoming. In separate interrogatory answers filed between November 9 and 14, 2000, several Plaintiffs declared that "the identity of Plaintiff's experts is undetermined at this time. Plaintiffs will supplement this interrogatory at such time as this determination is made." On November 20, Plaintiffs provided Defendant with copy of the report.

The issue of statistical disparity was not raised in Plaintiffs' initial suggestions. The issue was presented to the Court for the first time in the Reply Suggestions in Support of Motion for Class Certification filed on December 18, 2000. This was also the first time the Court was presented a copy of Dr. Chen's report.

Defendant filed two motions targeting the report: a Motion to Preclude its filing and once it was filed, a Motion to Strike. Plaintiffs' response—and justification for their actions—can be summarized as follows:

1. The report is critical to their success.

2. Defendant did not produce employment information in a computer format until October 17, 2000.

3. Defendant knew Dr. Chen's identity on November 1 because it was disclosed in footnote 7 on page 12 of Plaintiffs' initial suggestions.

4. Defendant had access to the raw data, so it was not prejudiced.

Plaintiffs' first argument is irrelevant (and, as discussed herein, may not even be true). Trial by ambush is not the order of the day. Although Plaintiffs briefly alluded to their plan to use expert testimony from a statistician to demonstrate meaningful statistical disparities in pay, promotion or other policies, they contradicted this indication in their interrogatory answers and in their discussions with the Court.

The Court also believes that the report was not properly used to support the Reply Suggestions when the matter had not been discussed in Plaintiffs' opening suggestions. The only time statistics are mentioned in the opening suggestions on pages eleven and twelve, where the Plaintiffs point out that in a different case statistical evidence was relevant to the trial judge's decision to certify the class. It is at this point that footnote seven appears. Numerically-based facts are advanced in the motion itself, but no basis for these "facts" was identified. Critically, however, Dr. Chen's report represents Plaintiffs' first effort to demonstrate that any disparities are of statistical importance—Plaintiffs never offered any statistical support for their

arguments in the opening suggestions. Having failed to do so, they cannot cure the omission by introducing the topic, for the first time, in the reply suggestions.

The Court is also not persuaded by Plaintiffs' explanation for failing to disclose Dr. Chen in a timely manner. Plaintiffs place the blame on "Defendant's belated production of computer data" which purportedly delayed Dr. Chen's ability to prepare his report. Plaintiffs' Suggestions in Opposition to Defendant's Motion to Preclude Plaintiffs' Statistical Expert (Doc. # 112) at 3. Plaintiffs present no support for their claim that the production was "belated" because they have not explained how or when Defendant's obligation to produce the information in computerized format arose. According to the materials supplied by Plaintiffs, the data requested was provided in paper format on February 7, 2000 in response to Plaintiffs' first request for documents (which was mailed to Defendant on December 20, 1999). There is no dispute that the materials supplied were responsive to the request; Plaintiffs' complaint is that the materials were not computerized. Frankly, having reviewed the discovery request the Court does not believe it is clear that production of computerized data was required as part of a proper response; perhaps it is buried somewhere in the boilerplate. Nonetheless, having received paper copies reflecting the requested information instead of computerized data, Plaintiffs had two options: proceed with the information at hand or raise the dispute with the Court in a timely manner. Plaintiffs did neither. In fact, the earliest reference the Court has been provided reflecting Plaintiffs' dissatisfaction with Defendant's response is a letter to Defendant's counsel dated September 22, 2000. *See* Exhibit 2 to Plaintiffs' Suggestions in Opposition to Defendant's Motion to Preclude Plaintiffs' Statistical Expert. This does not speak well of either Plaintiffs' diligence or the importance Plain-

tiffs now place on the computerized data. A diligent party seeking critical information would have acted much sooner.

Plaintiffs also justify their actions by declaring that they have "chosen, based on prior guidance by this Court, not to engage in allegations of discovery improprieties or intentional conduct with regard to discovery matters such as the reasons for Defendant's production of data only two weeks before the certification deadline." Plaintiffs' Suggestions in Opposition to Defendant's Motion to Preclude Plaintiffs' Statistical Expert (Doc. # 112) at 8.[5] The Court is unsure what to make of this remark. If Plaintiffs requested the computerized data in December and did not get it until October, the dispute could and should have been presented to the Court long ago. Doing so would not have required Plaintiffs to allege improprieties or level charges of intentional misconduct; all that needed to be done was to demonstrate that the material had been requested, that the deadline for its production had passed, that informal efforts to resolve the problem had been attempted, and the data had not yet been received.[6] Finally, if Plaintiffs truly believe that the point of the Court's prior orders in *Ross v. Kansas City Power & Light* was that discovery disputes should not be presented to the Court, then they have horribly misunderstood the lesson they were supposed to learn.

The Court also observes that in the latest request for an extension of time, which was filed on August 30, 2000 (and denied in part and granted in part, coincidentally, on October 17, 2000), does not justify an extension of time based on Defendant's failure to produce computerized data. The only justification offered by the parties is their "agree[ment] that an additional period of time is necessary in order to adequately present the class certification issues to the Court."

---

5. It is not clear whether Plaintiffs' reference to "prior guidance by this Court" is a collective reference to all the judges in the Western District of Missouri or a specific reference to the undersigned. If it is the latter, it should be noted that this case was reassigned from the Honorable Scott O. Wright on October 13, 2000. Thus, Plaintiffs' concerns about the undersigned's personal views were relevant for only four days before they received the computerized data.

6. Of course, Plaintiffs' ability to make these representations may have been hampered by their failure to follow up with Defendant's counsel until September 2000.

The Court cannot harmonize Plaintiffs' present explanation that Defendant's delay caused the situation with (1) Plaintiffs' representation to the Court on November 3 or (2) Plaintiffs' responses to Defendant's interrogatory requests. Plaintiffs' representations that they did not have an expert constitutes inappropriate sandbagging, and they should not benefit from such a practice. This sequence of events also removes any force from Plaintiffs' suggestion that Dr. Chen was "identified" in footnote seven of the Suggestions. Additionally, the fact that Defendant had the data is irrelevant. First, Plaintiffs also had the data. Second, and most importantly, this is Plaintiffs' motion, and Plaintiffs bear the burden of persuasion. Moving parties are not allowed to wait until their reply suggestions to advance arguments and provide expert support for their positions, even if the underlying data is in the opposing party's possession.

For all of these reasons, the Court declines to consider Dr. Chen's report, and the Motion to Strike (Doc. # 118) is granted.

### (b) The Report's Value

██ Even if Dr. Chen's report were considered, it would not aid the pay subclass. (Plaintiffs' suggestion that the Court cannot consider this issue is rejected. *See Chaffin v. Rheem Mfg. Co.,* 904 F.2d 1269, 1276 (8th Cir.1990) and *Hervey v. City of Little Rock,* 787 F.2d 1223, 1228–29 (8th Cir.1986)). According to Dr. Chen, "the average pay for Caucasian employees is $48,951 with a standard deviation of $16,420 and the average pay for African–American employees is $42,583 with a standard deviation of $16,420." First Report of Statistical Analyses, § D(1). He also determined that "the average pay change (increase) amount for Caucasian employees is $759 with a standard deviation of $2176 and the average pay change (increase) amount for African–American employees is $453 with a standard deviation of $1914." First Report of Statistical Analyses, § D(3). Dr. Chen concluded that the "average pay rate of Caucasian employees" and "the average pay rate change (increase) amount of Caucasian employees" is statistically significantly higher than that for African–American employees.

The Court finds these conclusions to be unhelpful because they have no bearing on the legal standards applicable to this claim (and, for that reason, are probably not admissible at trial).

Classwide disparate treatment is usually proved by using statistics, but to be legally sufficient these statistics must show a disparity of treatment, eliminate the most common nondiscriminatory explanations of the disparity, and thus permit the inference that, absent other explanation, the disparity more likely than not resulted from illegal discrimination.

*Hervey,* 787 F.2d at 1228 (quotation omitted); *see also Watson,* 487 U.S. at 996–97, 108 S.Ct. 2777.

Dr. Chen has ignored two very important factual considerations. First, he has not taken into account one of the most obvious legitimate reasons two employees might receive different rates of pay; namely, different job responsibilities. Dr. Chen has considered and accounted for only one factor: race. By lumping all Caucasians in one group and all African–Americans in another group, Dr. Chen's analysis implicitly assumes that all jobs are the same—but clearly this is not true. A statistical disparity would be telling if it demonstrated a disparity in a particular job category (e.g., meter readers, electricians, attorneys, janitors, etc.), but this was not done.

Second, Dr. Chen has ignored the fact that many of Defendant's employees (approximately 1,400 out of a total workforce of approximately 2,200) belong to unions, and their pay, promotion and other terms of employment are governed by various collective bargaining agreements. Plaintiffs do not allege that any of the collective bargaining agreements are discriminatory, nor do they allege that any of them have been paid less than what was required under those agreements. These employees have no claim regarding discriminatory pay, yet Plaintiffs (and Dr. Chen) have grouped them together with other employees in an attempt to create a pay claim when they clearly do not have one. This results in two observations.

First, these employees should not be included in the class. Regardless of the statistical disparity that can be proved, disparity alone is insufficient; Plaintiffs must identify the practice that is being challenged. *Watson*, 487 U.S. at 994, 108 S.Ct. 2777. Given the non-discriminatory (or at least unchallenged) basis for paying union employees, those employees cannot pursue their claims. Second, the collective bargaining units differentiate pay on a variety of factors, particularly seniority. Thus, two employees performing the same job may be receiving different rates of pay because one has been working longer than the other. Dr. Chen made no effort to account for this legitimate basis for discrepancy; instead, his analysis ignores all factors except race. This flaw precludes reliance on his opinions.

Plaintiffs' reliance on statistical analysis would have been more useful if it had focused on those employees whose rate of pay is completely discretionary, and even then only if the analysis compared employees performing the same or similar jobs. Having failed to provide such an analysis, Plaintiffs' reliance on Dr. Chen's conclusions is inappropriate.[7]

### 2. *Numerosity*

■ Having failed to identify a policy or practice *or to present a useful statistical* analysis, Plaintiffs must demonstrate some other basis for satisfying Rule 23(a)'s requirements. They have identified four employees *who claim that they were paid less* than similarly situated Caucasian employees: Olen Gibson, Patricia Lang, Andrea Riggs and "Ms. Makene." Plaintiffs refer to Riggs' employment in the past tense, suggesting that she no longer works for Defendant, Plaintiffs' Statement of Common Facts, ¶ 162; thus, she cannot be benefitted by injunctive relief. Plaintiffs allude to "many other management (non-union) employees [who] have suffered race discrimination in pay at KCPL" but do not identify them. This is Plaintiffs' motion, and it is Plaintiffs' burden to persuade the Court to exercise its

discretion to certify a class. An oblique assurance that there are "many" affected individuals is insufficient.

■ The Court is left, then, with a subclass consisting of four people. This number is too low to satisfy the numerosity requirement, and is also too low to suggest the presence of a pattern or practice.

### 3. *Commonality*

■ The only common aspect is the nature of the subclass' legal claim. As noted earlier in Part III(B)(2), above, the lack of a policy or practice deprives this subclass of commonality sufficient to satisfy Rule 23(a). The generalized contention that "Defendant pays African–Americans less" could qualify as a policy if there were sufficient statistical and anecdotal support, but here there is none. Plaintiffs have not satisfied their burden to demonstrate commonality.

### 4. *Typicality/Adequacy of Representation*

■ The Court concludes that the claims of the subclass' members lack typicality because the individuals work in different departments. Thus, Patricia Lang—who was an architect—has claims that are not typical of, for instance, Olen Gibson—who worked in accounting. These individuals worked in different departments and had different supervisors, and different decisionmakers were involved in the pay decisions regarding these employees. Lang's and Gibson's claims are not typical. Moreover, these differences preclude Lang from adequately representing accountants' claims and preclude Gibson from adequately representing architects' claims. The lack of typicality also precludes a finding that the class representatives can adequately represent the interests of others.

### 5. *Injunctive Relief*

Plaintiffs' inability to identify a policy or practice makes classwide injunctive relief inappropriate. Consequently, certification under Rule 23(b)(2) is not proper.

---

7. Plaintiffs also point to Carlos Salazar's conclusory testimony in another trial to the effect that "minorities and females were being compensated at a lower rate than their peers, as white males, in the same job." Nothing more than this conclusion has been offered, so it is not entitled to much consideration.

### 6. Punitive Damages

The prior discussion foreshadows the Court's conclusion on this issue. To summarize: each Plaintiff with a pay claim will be comparing themselves to a different co-worker. Each Plaintiff worked in a different department, so the actions of different decision-makers are necessarily involved. There is little in common between these claimants, and certainly not enough to permit the Court to conclude that the common issues predominate over individual issues.

### D. Subclass IV—Promotions

### 1. The Expert's Report & Identification of an Employment Policy or Practice

■■■ Plaintiffs support their promotion claims with Dr. Chen's report. For the reasons discussed previously in Part II(C)(1)(a), Dr. Chen's report will not be considered. In addition, the Court notes that Dr. Chen's report would not advance Plaintiffs' cause. In contrast to his conclusions regarding pay, Dr. Chen's report focuses upon promotion into non-union positions. First Report of Statistical Analyses, § B. He concludes, based simply upon the race of Defendant's non-union employees, that Defendant's promotion decisions are based on race. Dr. Chen's failure to consider the racial makeup of the pool of applicants deprives his conclusion of any usefulness in this proceeding. *See Watson,* 487 U.S. at 995, 108 S.Ct. 2777. Statistical disparity, in a vacuum, is meaningless. The focus of Plaintiffs' claim should be on the exclusionary nature of some policy or practice, which necessarily requires proof that Defendant "select[s] applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (cited with approval in *Watson*); *see also Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 650–51, 653–54, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). Dr. Chen does not compare Defendant's promotion practices to any pool of applicants, much less a relevant pool of applicants, and for that reason his report will not further the promotion claims.

Plaintiffs also argue that Defendant's promotion policies are completely subjective. This fact, alone, would not justify certification. "It is true, to be sure, that an employer's policy of leaving promotion decisions to the unchecked discretion of lower level supervisors should itself raise no inference of discriminatory conduct." *Watson,* 487 U.S. at 991, 108 S.Ct. 2777. The Supreme Court has recognized the value and legitimacy of subjective factors in employment decisions and voiced concern that employers not be required to adopt quotas in creating their work forces, *id.* at 991–93, 108 S.Ct. 2777, and in so doing has cautioned that

> the plaintiff's burden in establishing a prima facie case goes beyond the need to show that there are statistical disparities in the employer's work force. The plaintiff must begin by identifying the specific employment practice that is challenged. Although this has been relatively easy to do in challenges to standardized tests, it may sometimes be more difficult when subjective selection criteria are at issue. Especially in cases where an employer combines subjective criteria with the use of more rigid standardized rules or tests, the plaintiff is in our view responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities.

*Id.* at 994, 108 S.Ct. 2777. Absent the necessary and appropriate statistical analysis, there is no suggestion that Defendant's policies have a disparate impact on minorities.

The Court also observes that the record does not support the wide-ranging discretion Plaintiffs suggest exists. Joe Ann Alexander, the Manager of Employee Relations in the Human Resources Division, described the process as follows:

> As to promotions to non-union or management positions, KCPL posts most openings below the level of Manager and accepts applications for those positions pursuant to KCPL's Position Opportunity Program ("POP"). The Human Resources Division works with departments that have open positions to determine how each job will be filled, i.e., by internal posting or POP, by soliciting outside candidates through ad-

vertising or through other referral sources, by selecting an internal candidate, or by a combination of these methods. If a position is POPed, Human Resources prepares the job announcement which lists the established minimum qualifications for the position, reviews applications for minimum qualifications, and forwards the applications of the minimally qualified applicants to the department for decision. As requested, Human Resources confers with the department regarding the selection process, the final decision, and/or the terms of an offer to a successful candidate. The final selection decision is made by the department in which the job is located. Alexander Affidavit, ¶ 4. After piecing together Plaintiffs' descriptions of Defendant's promotion practices, the Court finds that Plaintiffs' overall depiction is largely the same as Alexander's.

Plaintiffs place much emphasis upon the fact that the Human Relations Department reviews applications to see if the applicant meets the minimum qualifications for the job. There is nothing in this fact that aids Plaintiffs. First, someone has to conduct the review; if applications were not reviewed to guarantee satisfaction of requirements, then there would be no point in having minimum requirements. Second, given that the minimum qualifications are objective criteria (e.g., level of education, years of experience), the fact that Human Resources performs this function is of little consequence. Plaintiffs also rely upon Human Resources' role to demonstrate a centralized policy, but clearly this is an inaccurate description. Finally, Plaintiffs never link Defendant's practices or policies to discrimination.

Plaintiffs also decry Defendant's failure to post all job openings. The record reflects that all union positions are posted as required by the various collective bargaining agreements. Thus, if this is the policy that forms the basis for this subclass, the subclass must be redefined to exclude all union employees. In any event, there is no requirement that an employer promote from within; an employer can legitimately decide to seek a manager from outside the company. An employer can also decide that a particular person is ideally suited for a promotion and offer a promotion to that individual only instead of soliciting applications. These legitimate decisions—particularly the latter one—certainly provide those who wish to discriminate with the means to do so. However, Plaintiff has not suggested how the occasional decision not to post a promotion opportunity had a disparate impact on minorities' opportunities.

### 2. Numerosity

■■ Upon reviewing the Second Amended Complaint and the supporting materials supplied by Plaintiffs, the Court has identified thirteen individuals who ostensibly claim to have been denied promotions based on race. Of these, the description of two—Mary Rabon and Andrea Riggs—is in the past tense, suggesting they are no longer employees. Thus, they cannot be benefitted by an injunction and cannot be members of the injunctive class. Five others—Angela Baker, Dee Hamilton, Danita Fagins, Regina Curry and Mary McDaniel—described conditions in the Call Center and declare that the "Call Center was racially discriminatory in terms of promotions and it was racially hostile." Conspicuous by absence—particularly when compared to the statements of the other prospective class members—is any indication that these employees applied for promotions. Ultimately, these observations matter little, for even a class of thirteen is insufficiently numerous to justify certification—particularly in the light of Plaintiffs' inability to identify a policy that results in a disparate impact or to properly document a statistical disparity in Defendant's promotion practices.

### 3. Commonality, Typicality, Adequacy of Representation, Injunctive Relief and Punitive Damages

The Court's prior discussions of these points are equally applicable at this juncture.

### E. Subclass V—Discipline, Termination and/or Retaliation

#### 1. The Expert's Report

Plaintiffs rely on Dr. Chen's report to support their claims of disparate discipline, ter-

mination and retaliation, but his report addresses only the first two issues. He has compared the percentage of terminations involving African–American employees to the percentage of African–American employees in Defendant's workforce and concluded that the difference between those percentages indicates that race is a factor. With respect to discipline, Dr. Chen identified four disciplinary actions (written warning, verbal warning, suspension, and termination) and, after performing an analysis similar to that applied to terminations, concluded that African–American employees were disciplined at a rate greater than should be expected given the percentage of African–American employees in Defendant's workforce.

For the reasons expressed in Part II(C)(1)(a), above, the Court will not consider Dr. Chen's report. The Court also believes that it was improper to group all four disciplinary actions into a single group. Doing so obscures the possibility that there is racial disparity within one of the categories. Finally, the Court observes that, as with his analysis of pay, Dr. Chen did not take into account the existence of collective bargaining agreements. These agreements establish discipline and grievance procedures for employees covered by those agreements, and Plaintiffs do not contend that those procedures are infirm.

### 2. Numerosity

■ Based simply on the number of African–American employees who have been terminated or disciplined, the Court holds that there are sufficient numbers of individuals who might have a claim to satisfy the numerosity requirement. The Court holds, however, that this is insufficient to certify a class of individuals asserting claims of retaliation. Plaintiffs offer no basis for deriving the number of those with retaliation claims from those who have been terminated and/or otherwise disciplined. A review of the materials Plaintiffs have submitted reveals only nine employees who might have claims of retaliation. Of these, five (Judy Steward, Angela Baker, Danita Fagins, Regina Curry, and Mary McDaniel) worked in the Call Center. The rest worked in diverse places: Michelle

Green (Transmission and Distribution), Rachelle Price (Customer Operations), Grover Harris (the Hawthorne Plant) and Norman Walker (unidentified). With respect to these employees, the proposed Third Amended Complaint conclusorily declares that they worked in a "retaliatory work environment" but does not actually allege they were the victims of retaliation. Their affidavits are unhelpful because they do not mention retaliation.

### 3. Commonality/Typicality

■ Those asserting claims of discriminatory discipline and termination can satisfy the commonality requirement only to the extent that the same legal standards will govern their claims. Undeniably, however, there will be many factual variations for each member of the proposed class. As noted earlier, "[f]actual variations in the individual claims will not normally preclude class certification *if the claim arises from the same event or course of conduct as the class claims, and* gives rise to the same legal or remedial theory." *Alpern,* 84 F.3d 1525, 1540 (8th Cir.1996) (emphasis added). Thus, for instance a person who received a written warning has nothing in common with and is not typical of a person who was suspended, and a meter reader receiving a written warning has nothing in common with and is not typical of the claim of an employee at the Call Center who receives the same discipline. Similarly, a person who was terminated as a disciplinary measure has nothing in common with and is not typical of a person who was terminated for economic reasons (as in a reduction in force). Further informing the inquiry is the fact that each class member will have to identify a similarly situated Caucasian employee with which to compare themselves. *Cf. Kline,* 175 F.3d at 670–71. Plaintiffs have not sufficiently discussed the retaliation claims to allow for meaningful inquiry, and for that reason they have not carried their burden of demonstrating typicality. The Court concludes that Plaintiffs' claims of retaliation and disparate discipline and termination lack both commonality and typicality.

#### 4. Adequacy of Representation

The Court's prior discussions on this point are equally applicable here: the lack of typicality precludes a finding that the class representatives can adequately represent the class members' interests.

#### 5. Injunctive Relief

The failure to satisfy Rule 23(a)'s requirements makes consideration of Rule 23(b) unnecessary.

#### 6. Punitive Damages

Based on the discussion in Part II(E)(3), above, the Court concludes that (1) the common issues do not predominate over the individual issues and (2) a class action is not the superior method for litigating the Plaintiffs' claims for punitive damages.

### F. Miscellaneous Matters

There are several additional issues that require discussion. These matters do not fit neatly in the preceding discussion. These issues have been set forth separately below.

#### 1. Temporary Promotions/"Step-ups"

On occasion, Defendant temporarily promotes employees to the next position; these temporary promotions are sometimes referred to as "step-ups." Step-ups usually occur when an employee goes on vacation, retires, quits, or at other times when a temporary replacement for a supervisor is required. Plaintiffs have included several passing references to the denial of step-ups, but the Court has not considered them in the course of deciding whether to certify a class. First, the claims to be asserted by the putative class are set forth in paragraph 2 of the Second Amended Complaint, but step-ups are not listed. Second, Plaintiffs have not provided any material purporting to justify certification of a subclass based on denial of opportunities to step-up.

#### 2. Former/Future Employees

At various times, the Court has noted that certain Plaintiffs/proposed class representatives are former employees. The Court doubts that it has identified all of them, primarily because Plaintiffs have not always been clear in differentiating between former and current employees.

The distinction is significant to the analysis under Rule 23(b)(2). With the possible exception of reinstatement, none of the equitable relief sought (indeed, none of the equitable relief that can be ordered) will aid former employees. For instance, if the Court orders training to combat racial harassment, a former employee will not benefit from the hoped-for improved working environment. If the Court orders changes in the manner in which salaries are paid, a former employee will not be benefitted by the new policies. (Such an employee might be entitled to damages, but this is not a factor to be considered under Rule 23(b)(2)). This point affects the inquiry with respect to numerosity, typicality, and adequacy of representation.

The Court also observes that Plaintiffs have not defined the class to include future African–American employees, but even if they had the result would be the same. If this change in the class definition were enough, every case could be a class action; a single employee could simply assert a claim on behalf of him/herself and all future employees, thereby creating "instant numerosity."

#### 3. Common Evidence/Consultants & Surveys

Plaintiffs argue that one of the strong factors favoring certification is that "many of the same facts will be relevant and admissible in the separate trial of each and every Plaintiff, Proposed Joinder Plaintiff, and Class Member." Plaintiffs' Statement of Common Facts at 2. The Court disagrees with Plaintiffs' contention.

The first piece of allegedly common evidence is a 1995 "Cultural Audit" performed by Nichols & Associates. This document is, essentially, a survey of Defendant's employees. It reports that more African–American employees than Caucasian employees perceived discrimination and race relations to be a problem. The report also suggested changes Defendant should consider instituting. Plaintiff does not explain how a survey

of this sort can be admissible. It seems that the hearsay rule prevents it from being used as substantive evidence to prove that "discrimination" exists. Even if this were not the case, the survey would not be helpful. For instance, one of the findings is that 34% of Defendant's African–American employees reported that discrimination is pervasive. Is this a reference to pay? promotions? discipline? The survey does not provide sufficient detail. Most fatally, however, the survey reflects opinions that are not admissible. A person cannot testify simply that "Defendant discriminates" or that "discrimination is a problem." These are conclusions and/or opinions that an individual witness would not be permitted to provide, and this determination is not altered by the fact that Plaintiffs have a survey indicating that many employees share this opinion.

The report might be admissible not as substantive evidence but rather as evidence demonstrating notice to Defendant. This use has limited value in the context of the class certification effort. Notice is not relevant to any of the causes of action except the hostile environment claims. However, there is no part of the report that clearly relates to that issue. Notice might also be relevant to the issue of punitive damages, but as noted Plaintiffs' primarily request certification for injunctive purposes. It is true that Plaintiffs do seek certification of a punitive damage class under Rule 23(b)(3), but the report does not alter the fact that individual issues predominate over common issues.

Another consultant, LGC & Associates, prepared a memorandum in January 1996 that Plaintiffs believe constitutes "common" facts. The memo summarizes the "results of [the author's] discussion with John Brewer" and lists opinions relating to "barriers for diversity at KCPL," why there are "so few People of Color in Management positions," "[w]hy People of Color are reluctant to report acts of racism," and concludes with some recommendations. As a summary of a single (as-yet unidentified) individual's opinions, the report's admissibility is not clear.

LGC & Associates conducted a survey of employees at the Hawthorne Plant. This survey suffers from the same infirmities discussed earlier with regard to the Nichols & Associates report. In addition, its scope is limited to the Hawthorne Plant, and therefore has no application to the experiences (or claims) of class members who did not work at the Hawthorne Plant.

The "common facts" referenced in this section are not admissible on issues relevant to the certification effort for a variety of reasons, and in at least one instance are not even "common" to all members of the class. Consequently, the Court has not considered these matters in determining whether the instant motion should be granted.

### 4. Defendant's Motion to Stay Discovery

This Order also impacts Defendant's Motion to Stay Discovery (Doc. # 135), which is hereby denied as moot. A separate order issued concurrently with this one provides greater detail regarding the future processing of this case. However, the Court deems it necessary to address one of the arguments made by Plaintiffs in response to the motion.

Defendant's motion was predicated on the fact that discovery was previously limited to class certification issues, and with the fully-briefed motion for certification pending there was no justification for further discovery. Plaintiffs complain that the discovery was not completed before the certification request was fully briefed because Defendant "refused to allow" certain depositions to take place. Included with Plaintiffs' protests is their expectation that the Court will be considering new evidence as part of the certification request. Plaintiffs' expectation does not conform to the Court's plan. A fully briefed motion is ripe for a ruling, and the Court has not been asked to—nor does it intend to—delay a ruling so that more evidence can be marshaled.

### III. CONCLUSION

For the foregoing reasons, (1) Plaintiffs' Motion for Oral Argument (Doc. # 129) is denied, (2) Defendant's Motion to Strike Expert Testimony (Doc. # 101 and Doc. # 118) is granted, (3) Plaintiffs' Motion for Class Certification (Doc. # 85) is denied, and (4)

Defendant's Motion to Stay Discovery (Doc. # 135) is denied as moot.

The Court believes this order involves controlling questions of law as to which there is ground for differences of opinion, and an immediate appeal may advance the termination of the litigation. Accordingly, this Order is certified for an interlocutory appeal as permitted by 28 U.S.C. § 1292(b). *Cf. In re Alleghany Corp.*, 634 F.2d 1148, 1149 (8th Cir.1980) (approving application of section 1292(b) to orders denying class certification).

Whether the appeal should be pursued is, of course, entirely up to Plaintiffs. However, they are reminded that the statute requires the application be made to the Court of Appeals within ten days.

As provided in section 1292(b), the certification of this order for interlocutory appeal does not stay proceedings in this Court.

IT IS SO ORDERED.

